**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

NICOLAS REYES,

     Plaintiff,

v.

Civil Action No. 3:18CV611

HAROLD CLARKE, et al.,

     Defendants.

## MEMORANDUM OPINION

Nicolas Reyes, a Virginia inmate proceeding with counsel filed this 42 U.S.C. § 1983 action. The matter is before the Court on Defendants' MOTIONS TO TRANSFER. ECF Nos. 39, 44. For the reasons set forth below, the Western District of Virginia is the more logical and convenient forum in which to adjudicate the claims at bar. Accordingly, the MOTION TO TRANSFER, ECF Nos. 39, 44, will be granted. The MOTION TO DISMISS FOR IMPROPER VENUE, ECF No. 13, will be denied.

## I. SUMMARY OF PERTINENT ALLEGATIONS

Reyes "is a 47-year-old native of El Salvador, who has been in the custody of the [Virginia Department of Corrections, ("VDOC")] since 2001. Reyes is a monolingual Spanish speaker, and is unable to read or write in any language." Compl. ¶ 16.[1]

---

[1] The Complaint does not state the basis for Reyes' incarceration. However, a newspaper article written after the Complaint was filed, states that Reyes "was sentenced in Alexandria Circuit Court to a total of 47 years for the first-degree murder

Following a 2006 altercation with his cellmate at Wallens Ridge State Prison, "VDOC sent Reyes to Red Onion [State Prison] and placed him in the long-term solitary confinement unit, where he remains to this day." Id. ¶¶ 67-71, 72.² Red Onion is located in the Western District of Virginia.

## A. Alleged Acts And Omissions Of The Defendants And Defendants' Places Of Residence

### 1. Clarke

Clarke is the Commissioner of the VDOC and sets policy for the VDOC, including the long-term segregation policy at Red Onion State Prison. Id. ¶ 165. "Defendant Clarke also dictates the extremely harsh conditions of confinement for prisoners in long-term solitary confinement, including [] Reyes." Id. ¶ 167. Clarke resides in the Eastern District of Virginia, in Henrico County. ECF No. 40, at 5.

### 2. Robinson

Robinson is the Chief of Corrections Operations for the VDOC. Compl. ¶ 170. Robinson "is responsible for approving VDOC's long-term segregation policy and overseeing its implementation." Id.

---

of his live-in girlfriend in 1991. He fled to Miami and was not arrested until 2000." Mentally Ill Man Held in Solitary Confinement in Va. Prisoner for 12 ½ years, ACLU Says, https://www.richmond.com/news/local/crime/mentally-ill-man-held-in-solitary-confinement-in-va-prison/article_a9e280a6-677d-599a-a389-fc38795d0196.html (last visited Aug. 27, 2019).

² The Court will refer to Red Onion State Prison as "ROSP" or "Red Onion."

Robinson resides in the Eastern District of Virginia, in Powhatan County. ECF No. 40, at 5.

### 3. Kiser And Barksdale

Kiser is the Warden of Red Onion.[3] Compl. ¶ 173. Barksdale was the Warden of Red Onion prior to Kiser. Id. ¶ 178. Kiser and Barksdale failed "to ensure that limited English proficiency prisoners such as [] Reyes have adequate translation services." Id. ¶¶ 173,178. Kiser and Barksdale were and are "directly responsible for decisions removing prisoners from Level S (i.e., long-term segregation) classification to a less restrictive security level." Id.

Kiser and Barksdale were and are "responsible for training correctional staff and for exercising oversight to ensure that [their] correctional officers perform their duties in a professional manner . . . ." Id. ¶¶ 174, 179. Despite receiving "numerous reports of correctional officers refusing to take prisoners in solitary confinement outside for recreation or to showers and of correctional officers giving prisoners empty food trays," Kiser and Barksdale took no steps to correct this misconduct. Id. Kiser resides in the Western District of

---

[3] There are two defendants named Kiser. Jeffrey Kiser and Justin Kiser. This opinion will refer to Jeffrey Kiser simply as "Kiser" and Justin Kiser as "Justin Kiser."

Virginia, in Russell County. ECF No. 40, at 5. Barksdale resides in the Western District of Virginia, in Charlotte County. Id.

### 4. Mathena

Mathena became Warden of Red Onion in 2011. Compl. ¶ 180. As Warden, Mathena had the same failing as Barksdale and Kiser described above. Id. ¶¶ 180, 181.

> Defendant Mathena currently works at VDOC headquarters as the head of Security Operations. As Security Operations Manager, he serves as the Chairman of the External Review Team. In this role, Defendant Mathena performs biannual reviews of each prisoner assigned to Red Onion at Security Level "S" (i.e., in solitary confinement) to determine if the prisoner should move out of solitary confinement. [] Reyes remains in solitary confinement due to Defendant Mathena's failure to perform a meaningful review of the necessity of [] Reyes'[s] continued isolation.

Id. ¶ 182. Mathena resides in the Eastern District of Virginia, in Goochland County. ECF No. 40, at 5.

### 5. Gallihar

Gallihar is the Chief of Housing and Programs for Red Onion. Compl. ¶ 183.[4] "Defendant Gallihar has abdicated his responsibility as a member of the (DTT) to advise the Regional Operations Chief and Warden that [] Reyes does not meet the criteria for segregation." Id.

> Defendant Gallihar also serves on the Building Management Committee and bears responsibility for the

---

[4] Institutional Classification Authority ("ICA"), the Dual Treatment Team ("DTT"), and by the External Review Team ("ERT") review the propriety of maintaining an inmate in solitary confinement. Compl ¶¶ 77, 80.

4

decisions of the Building Management Committee. In this role, Defendant Gallihar is responsible for assigning, or in the alternative, for recommending offenders to SM 0,[5] SM 1, and SM 2 privilege levels and for discussing and preparing recommendations for the ICA and DTT. Defendant Gallihar has failed to meaningfully assess and review [] Reyes'[s] status, and so has caused [] Reyes to remain in segregation at the lowest privilege level for years.

Id. ¶ 184. Gallihar resides in the Western District of Virginia, in Wise County. ECF No. 40, at 5.

### 6. Duncan and Collins

Defendants Duncan and Collins performed Administrative Reviews of [] Reyes'[s] segregation ICA reviews. They abdicated their responsibility to perform meaningful reviews of [] Reyes'[s] continued placement in solitary confinement. At each 90-day review, they merely rubberstamped the recommendation of lower-level staff. Due to their failure to perform even a modicum of investigation or oversight into [] Reyes'[s] solitary confinement status, [] Reyes spent years in solitary confinement . . . .

Defendant Duncan is the former C-Building Unit Manager. Defendant Collins is the current C-Building Manager. As Unit Manager, Defendants Duncan and Collins are responsible for ensuring that the correctional officers in their unit perform their duties in a professional manner that follows correctional policy and that respects the inherent dignity of the incarcerated persons in their care. Despite numerous reports of correctional officers refusing to take prisoners on their units outside for recreation or to showers and giving prisoners empty food trays -- including reports specific to [] Reyes -- Defendants Duncan and Collins took no steps to correct this misconduct. By failing to take corrective action to ensure the correctional staff

---

[5] "In 2011, VDOC began transitioning to the Step-Down or 'Pathways' Program with the purported goal of providing a defined pathway for prisoners to transition out of long-term, indefinite solitary. Under the Step-Down Program, there are two pathways [out of solitary confinement]: Intensive Management (IM) and Special Management (SM)." Id. ¶ 58 (citation omitted).

under their supervision provide prisoners appropriate care, Defendants Duncan and Collins all but ensured that mistreatment of the kind [] Reyes endured would occur.

Compl. ¶¶ 185–86 (emphasis omitted). Duncan resides in the Western District of Virginia, in Wise County. ECF No. 40, at 5. Collins resides in the Western District of Virginia, in Dickenson County. Id. at 6.

### 7. Justin Kiser, Gilbert, Adams, and Lambert

Defendants Justin Kiser, Gilbert, Adams, and Lambert are or have been members of the ICA responsible for reviewing the continued segregation of [] Reyes during his time in solitary confinement. They have abdicated their responsibility to perform meaningful reviews of [] Reyes'[s] continued placement in solitary confinement. At each 90-day review, they merely retained [] Reyes in segregation at the lowest privilege level due to [] Reyes'[s] purported failure to participate in programming. Due to their insistence that [] Reyes complete the Step-Down Program journal series, [] Reyes spent years in solitary confinement in unconstitutional conditions and suffered lasting psychological damage.

Compl. ¶ 187 (emphasis omitted). Justin Kiser and Lambert reside in the Western District of Virginia, in Dickenson County. ECF No. 40, at 6. Gilbert resides in the Western District of Virginia, in Scott County. Id. Adams resides in Eolia, Kentucky. Id.

### 8. Lee

Defendant Lee is a member of Central Classification Services. He is responsible for approving prisoner transfers out of long-term solitary confinement units for mental health reasons. Due to Defendant Lee's refusal to approve the transfer of [] Reyes to a residential mental health unit because of [] Reyes'[s] inability to speak English, [] Reyes continues to suffer in unconstitutional conditions in solitary confinement.

6

Compl. ¶ 188 (emphasis omitted). Lee resides in the Western District of Virginia, in Roanoke City. ECF No. 40, at 6.

### 9. Huff, Trent, and McDuffie

Defendants Huff, Trent[,] and McDuffie are []
Reyes'[s] treating mental health professionals. They
have failed to address the obvious primary cause of []
Reyes'[s] poor mental health: his unending solitary
confinement. As qualified mental health professionals,
Defendants Huff and Trent serve on the Building
Management Committee and Dual Treatment Team, and are
responsible for making recommendations and decisions
regarding [] Reyes'[s] ongoing solitary
confinement. Defendants Huff, Trent[,] and McDuffie
also have failed to perform a comprehensive mental
health evaluation of [] Reyes so as to render a
meaningful diagnosis and develop a treatment plan.
Defendants' repeated failure to use translation services
when communicating with [] Reyes places him at immense
risk. Defendants Huff, Trent[,] and McDuffie refuse to
designate [] Reyes as seriously mentally ill and
functionally impaired, despite a long history of
psychotic behavior evident in the medical record. As a
result of Defendants' unconstitutional conduct, [] Reyes
continues to suffer in unconstitutional conditions in
solitary confinement, and his mental health will
decline.

Compl. ¶ 189 (emphasis omitted). Trent resides in the Western District of Virginia, in Wise County. ECF No. 40, at 6. Huff resides in Cumberland, Kentucky. Id. McDuffie resides in Bountville, Tennessee. Id.

### 10. Herrick

Defendant Herrick is the Director of Health
Services for VDOC. He is responsible for ensuring that
all VDOC prisoners, including [] Reyes, have adequate
access to health services. On information and belief,
Defendant Herrick has failed to institute a policy
requiring that all mental health staff use

7

interpretation services when communicating with limited English proficiency prisoners such as [] Reyes. Defendant Herrick is well aware that VDOC has limited English proficiency prisoners and that without interpretation services, there exists a significant and unacceptable risk that mental illness will go undiagnosed or misdiagnosed in this population. Defendant Herrick is also aware that long-term solitary confinement causes and exacerbates mental illness. Yet Defendant Herrick failed to ensure that mental health staff properly assess solitary confinement prisoners for decompensation and advocate for the removal of prisoners like [] Reyes who have decompensated in such conditions. As a result of Defendant Herrick's actions and omissions, [] Reyes continues to suffer in unconstitutional conditions in solitary confinement, and his mental health will decline.

Compl. ¶ 190 (emphasis omitted). Herrick resides in the Eastern District of Virginia, in Chesterfield County. ECF No. 40, at 6.

## B. Solitary Confinement and the Step-Down Program

"In 2011, VDOC began transitioning to the Step-Down or 'Pathways' Program with the purported goal of providing a defined pathway for prisoners to transition out of long-term, indefinite solitary. Under the Step-Down Program, there are two pathways [out of solitary confinement]: Intensive Management (IM) and Special Management (SM)." Compl. ¶ 58 (citation omitted). "Each pathway consists of privilege levels 0, 1, and 2." Id.

For inmates, such as Reyes, on the SM pathway, "[t]he basic Step-Down Program consists of seven English-language journals called 'the Challenge Series,' that purport to change the behavior and mindset of prisoners to improve their likelihood of success in general population. In-person instruction accompanies journals

three through seven." Id. ¶ 61. Under the program, prisoners "such as [] Reyes are entitled to progressively earn more privileges as they move through the program." Id. ¶ 76.

Although Reyes satisfied the behavioral prerequisites for progressing in the Step-Down Program on the SM pathway, as

a non-English speaker, unable to read and write, and [with] mental health limitations, [] Reyes was unable to participate in the journal series component of the Step-Down Program, thereby making it impossible for him to progress out of solitary confinement without assistance or accommodations. And because of Red Onion correctional officers' hostility towards Spanish speakers and persons of Central American descent like [] Reyes, such assistance and accommodation have been withheld.

Id. ¶ 64 (emphasis added).

"As an SM prisoner, [] Reyes is entitled to reviews of his segregation classification and progress through the Step-Down Program every 90 days by a designated staffer or staffers known as the Institutional Classification Authority (ICA)." Id. ¶ 77 (citing Attach. A). "The Building Management Committee, comprised of mental health and correctional staff with direct knowledge of the prisoners in their custody, is responsible for making recommendations to the ICA, including recommendations regarding assignment of prisoners to privilege levels (0, 1, or 2)." Id. ¶ 78.

The ICA reviews the progress of individual prisoners through the IM and SM pathways as well as their on-going segregation classification. For these segregation interim ICA reviews, a reporting staff

member first makes a recommendation as to whether a prisoner should be retained in solitary confinement, and if so, at what privilege level (0, 1, or 2). On information and belief, this recommendation reflects the decision of the Building Management Committee. The ICA then reviews the staff recommendation internally before adopting it. All interim segregation reviews are also reviewed by the Facility Unit Head (currently Defendant Warden Kiser) or his designee.

Id. ¶ 79. Additionally, Reyes is

entitled to have his status in segregation reviewed by the Dual Treatment Team (DTT) and by the External Review Team (ERT). The DTT is responsible for reviewing solitary confinement classifications and making recommendations as to whether prisoners are properly classified. The DTT also reviews mental health assessments to determine appropriate housing. The ERT reviews prisoners bi-annually to determine if they are appropriately classified to segregation, if they continue to meet criteria for the SM pathway, and if the DTT has made appropriate decisions to advance the prisoner through the Step-Down Program.

Id. ¶ 80.

According to Reyes, although the VDOC established procedures for reviewing an inmate's segregation or solitary confinement status, those reviews are essentially a sham. Id. ¶ 81. Reyes alleges that, "[a]lthough multiple levels of review ostensibly provide a veneer of procedure, they have operated instead as rubberstamps of one another and of [] Reyes'[s] indefinite solitary confinement." Id.

The ICA assigned Reyes to the SM pathway at Level 0 in December of 2012. Id. ¶ 99. According to Reyes:

[e]very 90 days thereafter, ICA staff conducted pro forma reviews that relied primarily on [] Reyes'[s]

10

supposed refusal to participate in the newly created Step-Down Program — a program that [] Reyes could not meaningfully participate in due to the lack of language access and his mental health disabilities — to justify his otherwise inexplicable retention in long-term solitary confinement.

Id. (emphasis added).

In February 2018, Reyes received a blue book. Id. ¶ 102.

Reyes does not understand what is in the book because it is in English, and he cannot read it. On information and belief, the blue book is part one of the Challenge Series that he must complete to leave solitary confinement. February 2018 was the first time [] Reyes received these course materials. At [] Reyes'[s] June 2018 ICA hearing, the ICA retained [] Reyes in solitary confinement, but moved him from SM 0 to SM 1 for the first time in six years, citing his participation in a Step-Down Program that he does not comprehend.

Id. (emphasis added). "There is no penological purpose to [] Reyes'[s] retention in solitary confinement. During the twelve and a half years that [] Reyes has been in isolation, he has accrued just seven disciplinary reports — none of them involving incidents of violence. He has not had a disciplinary report of any kind in over three years." Id. ¶ 104.

C. Conditions Of Confinement Specific To Reyes

The correctional officers treat Reyes with disdain because he is Latino, does not speak English, and has mental vulnerabilities. Id. ¶ 109. Correctional Officers regularly call Reyes and other Latino prisoners wetbacks and Mexicans. Id. ¶ 110. Correctional officers

11

ridicule his language, and they use his inability to speak and understand English as an excuse to not take [] Reyes outside for recreation or to the shower. Correctional officers understand that [] Reyes is unable to advocate for himself and that there will be no repercussions for their actions.

Id. ¶ 111.

It is alleged that Correctional officers:

have routinely deprived [] Reyes of meals, including for a full day at a time. For the seven years that correctional staff relegated him to the most restrictive form of solitary confinement, [] Reyes was categorically ineligible to work and earn money, and he was unable to purchase food items through commissary. When [] Reyes moved to SM 1 in June 2018, he became eligible for an in-unit job. SM 2 prisoners, however, have first priority for such assignments, and [] Reyes has not been assigned a job. His nutrition is dependent on the whims of the correctional officers who distribute food trays in his unit, and he often goes hungry. He has lost a substantial and unhealthy amount of weight while in solitary confinement due to Defendants' failure to provide adequate food.

Id. ¶ 113 (emphasis added). Reyes entered solitary confinement weighing 186 lbs. He has lost nearly 50 lbs. since that time, and today weighs just 138 lbs." Id. ¶ 112.

"For the majority of his time in isolation, VDOC policy provided that solitary confinement prisoners received no more than one hour of recreation five days a week. Recently, VDOC increased the policy to provide two hours of recreation five days a week." Id. ¶ 114 (citing Attach. C, O.P. 861.3.V.E.17.a (amended 1/16/2018)). Correctional officers, however, often fail to adhere to these guidelines:

In 2017, [] Reyes was taken out of his cell for recreation an estimated three times for the entire year. Now, [] Reyes goes outside for recreation roughly once every three-to-four weeks. For example, [] Reyes did not go outside for recreation once during the three-week period from on or about February 27 through on or about March 20, 2018 and again from on or about June 21 through on or about July 19, 2018.

Id. ¶ 115 (emphasis added).

Under Defendants' policy, Reyes, as a segregation prisoner, is entitled to three showers per week. Id. ¶ 120. Nevertheless,

Reyes is routinely denied the opportunity to leave his cell to shower, with the result that he showers no more than once or twice a week and often far less. Correctional officers refuse to take him out for showers until the odor emanating from his cell becomes overwhelming. In 2017, [] Reyes showered only a handful of times over the course of the year. On information and belief, staff did not take him to shower during the month of August 2018.

Id. (emphasis added). Also, in July of 2018, correctional officers confiscated Reyes' medically prescribed dandruff shampoo. Id. ¶ 121.

## D. Reyes' Deteriorating Mental Health

"Upon entering VDOC in April 2001, mental health staff designated [] Reyes MH-0, the lowest of five mental health codes, indicating that he had no recent history of mental health treatment and no current behavior evidencing a need for services." Id. ¶ 133. During the year that Reyes spent in solitary confinement in 2001 and 2002, he "was twice placed on suicide precautions and exhibited unusual and bizarre behavior including hollering, screaming, and dancing around his cell. A mental health note from

13

June 2002 reflects that [] Reyes'[s] condition necessitated psychotropic medication." Id. ¶ 134 (emphasis added).

In 2006, when Reyes was returned to Red Onion and again placed on solitary confinement, his mental health again deteriorated. Id. ¶ 136. In November of 2007, "Defendant Huff, a Qualified Mental Health Professional (QMHP), evaluated [] Reyes because he had not eaten in over eight days. Defendant Huff noted that [] Reyes appeared 'disheveled' and there was a strong smell of body odor emanating from his cell . . . ." and Reyes "was crying 'profusely.'" Id. ¶ 137. "Reyes also evidenced clear indicators of psychosis, 'making bizarre references to President Bush, the police, and making wide, arching military type salutes.'" Id. (emphasis added). "Defendant Huff deemed [] Reyes severely depressed and indicated that [] Reyes would be considered for referral to a mental health facility. [Nevertheless], Defendant Huff did not follow up on this referral, and [] Reyes was not referred to a mental health facility. He spent one day on a suicide watch before being returned to solitary confinement." Id. ¶ 138 (emphasis added).

"Over the next decade, [] Reyes continued to exhibit indicators of a serious psychosis, but the mental health staff charged with his care failed to take reasonable measures to address his decline." Id. ¶ 139 (emphasis added). For example, in 2009, a mental health professional observed that Reyes

14

> was "constantly looking from side to side and nodding, as if responding to internal stimuli" and noted that he appeared "gaunt," as though he had not eaten in some time. She ascertained that [] <u>Reyes was delusional and likely in need of acute treatment, as he "could continue to deteriorate if further interventions are not made." Despite these grave and prescient concerns, [] Reyes received no meaningful mental health treatment.</u>

<u>Id.</u> ¶ 140 (emphasis added).

In May of 2016, Trent, a Qualified Mental Health Professional,

> administered a "mini mental status examination." [] Reyes scored extremely poorly on this examination. Defendant Trent arbitrarily discarded [] Reyes'[s] results and attributed his poor performance to language limitations, even though an interpreter was present. Defendant Trent acknowledged a need to advocate on [] Reyes'[s] behalf with correctional staff regarding his inability to participate in programming and his need for support services. Either Defendant Trent failed to advocate on [] Reyes'[s] behalf or correctional staff refused to transfer [] Reyes from solitary confinement in response to Defendant Trent's advocacy. [] Reyes received no additional mental health treatment except for periodic wellness checks, and mental health staff continued to identify him as MH-0.

<u>Id.</u> ¶ 143. In November of 2016, Huff concluded that Reyes was not suffering from a serious mental illness ("SMI"). <u>Id.</u> ¶ 144. "Defendant Huff made this assessment without personally evaluating [] Reyes." <u>Id.</u>

> In the <u>fall of 2017</u>, VDOC began identifying SMI prisoners for possible diversion out of long-term segregation and into a Secure Diversionary Treatment Program (SDTP) at one of the institutions with special programming and individualized treatment services for SMI prisoners. Defendant Trent met with [] Reyes with the help of an interpreter to assess whether [] Reyes should be designated SMI. He found [] Reyes unkempt, suffering from possible psychosis, and unaware of "the building, town, and year." He diagnosed [] Reyes with

15

severe cognitive deficits and found him severely functionally impaired. Defendant Trent re-classified [] Reyes as MH-2S, indicating that [] Reyes was suffering under a substantial impairment.

Id. ¶ 145 (emphasis added). Nevertheless, "[o]n January 19, 2018, Defendant Lee denied [] Reyes a transfer to an SDTP, stating that [] Reyes should be re-examined. Defendant Lee suggested that [] Reyes appeared more mentally ill than he was because of his inability to speak English." Id. ¶ 146. Lee requested that Huff re-evaluate Reyes. Id. ¶ 147.

During his evaluation on January 22, 2018, Reyes could not recall basic information, such as the name of the institution where he was incarcerated. Id. Huff determined that Reyes' "depression could be a result of his inability to communicate with others. Defendant Huff was unable to rule out delusional thinking." Id. ¶ 148

When Trent evaluated Reyes on January 23, 2018, "Reyes was exhibiting severely disordered, grandiose and delusional thinking. He told Defendant Trent that he 'studied to be president of el Salvador, Guatemala, and Mexico.' [] Reyes was not oriented to person, time or situation." Id. ¶ 149.

On January 25, 2018, Reyes met with McDuffie, the Red Onion psychiatrist, for the first time. Id. ¶ 150. McDuffie diagnosed "Reyes with major depression, severe recurrent, and indicated that his mental disorder is an extreme impairment to functioning.

16

Defendant McDuffie prescribed Prozac, and would later prescribe Effexor, for [] Reyes'[s] depression and disordered thinking."

Id. (emphasis added). Thereafter, Huff

> reversed Defendant Trent's designation of [] Reyes as SMI. Defendant Huff did not identify [] Reyes as cognitively impaired, despite the fact that Defendant Huff had himself personally observed [] Reyes'[s] inability to recall basic facts. He acknowledged [] Reyes'[s] newly diagnosed depressive disorder, but in light of the new Prozac prescription, determined that [] Reyes no longer met the criteria for a functional impairment.

Id. ¶ 151. Reyes contends that "Defendant Huff's decision to rescind [] Reyes'[s] SMI designation was motivated in significant part by Defendant Lee's resistance to transferring [] Reyes out of solitary confinement and his calling [] Reyes'[s] SMI designation into question." Id. ¶ 152.

"As a result of the psychiatric medication he is taking, [] Reyes is increasingly lethargic and now sleeps during the day." Id. ¶ 153. "At other times, [] Reyes rants and raves inside his cell, sings gospel songs, and is the target of harassment and malign neglect from correctional officers. He reports daily conversations with dead family members and influential political leaders, and he sees these individuals appear inside his cell." Id. ¶ 154.

**E. Reyes' Claims**

Reyes raises the following causes of action in his Complaint.

Count I      Defendants violated Reyes' rights under the Eighth Amendment.

    (A)   Defendants' actions and omissions have caused Reyes to remain in solitary confinement for years.   Id. ¶¶ 192-94.

    (B)   Defendants have failed adequately to supervise correctional officers who regularly deny Reyes access to outdoor recreation and showers.   Id. ¶ 195.

    (C)   Defendants Huff, Trent, and McDuffie exhibited deliberate indifference to Reyes by
    (1) "failing to perform a comprehensive mental health evaluation at any point in [] Reyes'[s] incarceration," id. ¶ 196;
    (2) "failing to designate [] Reyes as seriously mentally ill and functionally impaired," id.;
    (3) "failing to take steps to remove him from solitary confinement and abate conditions that are obviously detrimental to his mental health," id.; and,
    (4) "failing to routinely communicate with [] Reyes through a Spanish-language interpreter," id.

Count II     Defendants Clarke, Robinson, Kiser, Barksdale, Mathena, Gallihar, Duncan, Collins, Justin Kiser, Gilbert, Adams, Lambert, and Lee violated Reyes' right to procedural due process under the Fourteenth Amendment by:

    (A) failing "to provide meaningful proceedings to determine the continued propriety or necessity of [] Reyes'[s] solitary confinement," id. ¶ 203; and,

    (B) interfering "with [] Reyes'[s] ability to progress through the Step-Down Program as provided in VDOC policy," id. ¶ 204.

Count III        In their official capacity, Defendants Clarke
                 and Kiser violated Reyes' rights under the
                 Americans with Disabilities Act ("ADA") by
                 failing   to   accommodate   Reyes'   mental
                 disabilities and denying him the benefits of
                 services because of these disabilities.   Id.
                 ¶¶ 207-215.

Count IV         In their official capacity, Defendants Clarke
                 and Kiser violated Reyes' rights under the
                 Rehabilitation Act of 1973 by failing   to
                 accommodate Reyes' mental disabilities and
                 denying him the benefits of services because
                 of these disabilities.   Id. ¶¶ 216-224.

Count V          Defendants Clarke, Kiser Barksdale, Mathena,
                 Gallihar,  Duncan,  Collins,  Justin  Kiser,
                 Gilbert, Adams, and Lambert violated Reyes'
                 right to equal protection under the Fourteenth
                 Amendment.[6]

                 (A)   The above-named Defendants intentionally
                 discriminated against Reyes on account of his
                 national   origin   and   limited   English
                 proficiency "by failing to provide access to
                 translation services during mental health
                 assessments, segregation review hearings and
                 as part of the Step-Down Program, thereby
                 excluding [] Reyes from participation in and
                 denying him the benefits of VDOC services."
                 Id. ¶ 227.   "Defendants refused to allow []
                 Reyes to leave solitary confinement unless he
                 learned to read and write in English, i.e.,
                 his non-native language."   Id. ¶ 228.

                 (B)   "Defendants Clarke and Kiser are well
                 aware that correctional officers engage in
                 discriminatory   treatment   towards   Latino
                 prisoners and prisoners from Central America,
                 yet they are deliberately indifferent to the

<hr>

[6] Reyes brings this claim against Clarke in his official
capacity, against Kiser in his official and individual capacity,
and against the remaining named Defendants in their individual
capacities.

> hostile environment that exists at Red Onion."
> Id. ¶ 230.

Count VI        In their official capacities, Defendants
                Clarke and Kiser violated Reyes' rights under
                Title VI of the Civil Rights Act of 1964. Id.
                ¶¶ 233-41.

## II. STANDARD FOR TRANSFERRING AN ACTION

The pertinent statute provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). The first inquiry is whether the claims "might have been brought" in the transferee forum. See id.; Byerson v. Equifax Info. Servs., LLC, 467 F. Supp. 2d 627, 631 (E.D. Va. 2006) (citation omitted). After that, the Court must consider and balance various factors to determine whether a transfer is warranted. Byerson, 467 F. Supp. 2d at 631.

Defendants, as the party moving for a transfer of venue, bear the burden of showing that the transfer is warranted. Beam Laser Sys., Inc. v. Cox Commc'ns, Inc., 117 F. Supp. 2d 515, 518 (E.D. Va. 2000) (citation omitted). "District courts within this circuit consider four factors when deciding whether to transfer venue: (1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties;

20

and (4) the interest of justice." Trs. of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc., 791 F.3d 436, 444 (4th Cir. 2015) (citations omitted). "The decision whether to transfer an action pursuant to § 1404(a) 'is committed to the sound discretion of the district court.'" BHP Int'l Inv. Inc. v. OnLine Exch., Inc., 105 F. Supp. 2d 493, 498 (E.D. Va. 2000) (quoting Verosol B.V. v. Hunter Douglas, Inc., 806 F. Supp. 582, 591 (E.D. Va. 1992)).

## A. The Action Could Have Been Brought In The Western District of Virginia

This first portion of this analysis is not contested by the parties. Defendants are requesting a transfer to the Western District of Virginia, Big Stone Gap Division. With respect to personal jurisdiction over Defendants, "[u]nder Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law." Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners, 229 F.3d 448, 450 (4th Cir. 2000) (citing ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 622 (4th Cir. 1997)). In Virginia, "a Virginia court may exercise personal jurisdiction 'over a person . . . as to a cause of action arising from the person's . . . [t]ransacting any business' in Virginia." Id. (alteration and omissions in original) (quoting Va. Code Ann. § 8.01-328.1(A)). Here, each of the defendants is sued in the

context of his or her employment for allegedly improper actions taken with respect to an inmate incarcerated in the Western District of Virginia while the inmate was in the care, custody or supervision of the Defendants. Thus, personal jurisdiction would be appropriate in Western District of Virginia.

Venue for an action may be laid in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(1). Here, unquestionably "a substantial part of the events or omissions giving rise to the claim[s] occurred" at Red Onion, which is located in the proposed transferee district. Thus, the action could have been brought in the Western District of Virginia.

**B. The Section 1404(a) Factors Weigh In Favor Of Transfer**

As outlined above, the factors to be considered for a § 1404(a) transfer motion are: "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." Trs. of the Plumbers & Pipefitters Nat. Pension Fund, 791 F.3d at 444 (citations omitted). These factors strongly support a transfer to the Western District of Virginia.

**1. Plaintiff's Choice Of Forum**

"As a general rule, a plaintiff's 'choice of venue is entitled to substantial weight in determining whether transfer is appropriate.'" Id. (quoting Bd. of Trs. v. Sullivant Ave. Props.,

LLC, 508 F. Supp. 2d 473, 477 (E.D. Va. 2007)). "But, if the plaintiff's choice of forum is neither the nucleus of operative facts nor the plaintiff's home forum, the plaintiff's choice is accorded less weight." Seaman v. IAC/InterActiveCorp, Inc., No. 3:18-CV-401, 2019 WL 1474392, at *4 (E.D. Va. Apr. 3, 2019) (citing Intranexus, Inc. v. Siemens Med. Sols. Health Servs. Corp., 227 F. Supp. 2d 581, 583 (E.D. Va. 2002)).

Reyes is a citizen of either Honduras or El Salvador. ECF No. 27, at 3. Reyes has been incarcerated in the Western District of Virginia since 2001. Before that, Reyes was hiding from authorities in Florida. Where ever Reyes' home forum may be, it is clear that it is not the Eastern District of Virginia. See Koh v. Microtek Int'l, Inc., 250 F. Supp. 2d 627, 634 (E.D. Va. 2003) ("For venue purposes a person is a resident only where he is a citizen and domiciled, or where he makes his home; residence does not arise out of a transitory abode or out of a temporary sojourn in a place other than that of residence or domicile." (quoting Finger v. Masterson, 152 F. Supp. 224, 225 (W.D.S.C. 1957))).

Reyes contends that his "constitutional and statutory claims arise in significant part from the acts and omissions of specific Defendants in Richmond who have implemented and (continue to implement) the policies and procedures designed in Richmond that are central to this litigation." ECF No. 48, at 9 (citation omitted). Reyes' constitutional and statutory claims, however, do

23

not rest only, or even heavily, upon facial challenges to Defendants' policies that may have been formulated in the Eastern District of Virginia. Instead, the nucleus of operative facts for Reyes' claims relies extensively upon the specific misconduct of Defendants and other individuals in the Western District of Virginia.

For example, Reyes' Eighth Amendment mental health claims rely on the alleged acts of deliberate indifference to his deteriorating mental health by Lee, Huff, Trent, and McDuffie, all of which occurred in the Western District of Virginia. Relatedly, Reyes' Eighth Amendment and Fourteenth Amendment claims about his solitary confinement do not merely rest upon a facial reading of the VDOC regulations that were approved in the VDOC offices in Richmond. Rather, those claims insist that the conditions in solitary confinement for Reyes at Red Onion are worse than those specified in the regulations. Further, Reyes' due process claims and equal protection claims rely heavily upon the inadequate reviews of the necessity of maintaining him in solitary confinement that took place at Red Onion. For example, Reyes contends that, because he does not speak English, he was not even aware the reviews were occurring. Although supervisory officials in the Eastern District of Virginia ultimately may bear some liability for allegedly inadequate oversight, the nucleus of operative facts for those claims rests squarely in the Western District of

Virginia. Considering the pleadings to date, Reyes' choice of forum in the Eastern District of Virginia is entitled to little weight. See Yoder v. Ryan, 318 F. Supp. 2d 601, 605-06 (N.D. Ill. 2004) (citation omitted) (stating that prisoners' choice of forum "is given no special weight" where the prisoners were not incarcerated in the forum and most of the material events did not take place in the forum).

## 2. Witness Convenience And Access

The convenience of witnesses is of considerable importance when considering a transfer, especially the convenience of non-party witnesses, whose location should be afforded greater weight in deciding a motion to transfer venue. See Fitzgibbon v. Radak, No. 3:18-cv-247, 2019 WL 470905 at *4 (E.D. Va. Feb. 6, 2019); Koh, 250 F. Supp. 2d at 636-37. The party asserting witness inconvenience must offer sufficient details respecting the witnesses and their potential testimony, "by affidavit or otherwise," to enable the Court to assess the materiality of evidence and the degree of inconvenience. Koh, 250 F. Supp. 2d at 636 (emphasis added). In other words, generally, "the influence of this factor cannot be assessed in the absence of reliable information identifying the witnesses involved and specifically describing their testimony." Bd. of Trs., Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc., 702 F. Supp. 1253, 1258 (E.D. Va. 1988) (footnote omitted). To satisfy the

burden that a forum is inconvenient for witnesses, generally the party seeking the transfer must provide particularized information of a witness' potential testimony, how that testimony is material and non-cumulative, or the degree to which it will be inconvenient to access that testimony in the present district. See Koh, 250 F. Supp. 2d at 636.

Defendants represent that they have complied a list of potential non-party witnesses to the action, and that list includes 110 current and former VDOC employees. ECF No. 40, at 4. Defendants represent that "Defendants and potential non-party witnesses reside in the following judicial districts:"

- Eastern District of Virginia: 15
  *11 non-party witnesses and 4 Defendants*

- Western District of Virginia: 92
  *82 non-party witnesses and 10 Defendants*

- Eastern District of Kentucky: 7
  *5 non-party witnesses and 2 Defendants*

- Eastern District of Tennessee: 3
  *2 non-party witnesses and 1 Defendant*

Id. at 6. In support of their Motion to Transfer, Defendants have submitted the affidavit of Defendant Kiser, the current Warden of ROSP. ECF No. 40-2. Initially, Kiser notes that, "ROSP is located approximately 368 miles away from the federal district courthouse in Richmond, Virginia." Id. ¶ 1. Kiser states that, "[o]f the seventeen named defendants, ten (10) are currently employed by or at ROSP." Id. ¶ 4. Additionally, "the fifty-four ROSP employees

26

who have been identified as potential witnesses include the ROSP institutional investigator, both institutional hearings officers, the assistant warden, the operations manager, the grievance coordinator, and numerous members of the ROSP medical, administrative, and security staff." Id. ¶ 6. Kiser asserts, in pertinent part, that:

> If this matter were to proceed to trial, the prolonged absence of the ten named defendants, alone, would be incredibly disruptive to the operation of ROSP, which is a maximum-security level facility that houses approximately 778 inmates.
> When also considering the potential absence of even a portion of the 54 non-party witnesses, the disruption to the operations of ROSP would be magnified. If a significant number of ROSP employees—including such critical personnel as the warden, assistant warden, operations manager, the chief of housing and programs, both institutional hearings officers, the institutional investigator, and senior members of our security staff—were compelled to be absent from this facility, over a period of several days, in order to testify at a jury trial in Richmond, ROSP would need to take extraordinary steps to ensure the continuing safety and security of this facility.
> Specifically, the absence of that number of employees would result in the prison being so understaffed that it could not be safely operated. ROSP would be compelled to either transfer a portion of its current inmate population to other VDOC facilities, and/or bring in correctional officers and employees from other VDOC facilities to help staff the prison.
> . . . .
> Finally, if any ROSP inmates were identified as potential witnesses in this action, transporting those inmates to Richmond for purposes of trial would also present logistical issues, the severity of which would vary depending upon the number of inmates called to testify. Considering the distance between ROSP and the federal courthouse in Richmond, any testifying inmates would need to be transported to the Richmond area the day before trial, and temporarily placed at a facility

that could safely house level "S" inmates. For the reasons discussed in paragraph 11, temporarily transferring level "S" inmates presents logistical difficulties, which would be amplified in the potential absence of enough security officers to escort these inmates to the Richmond area. The transporting officers would be in addition to any ROSP staff members who would be called to testify at trial, and in addition to the number of officers who would need to be left behind to safely staff the prison. Additional logistical concerns include the possible need to house inmate witnesses at multiple separate facilities, depending upon their security levels and any "enemy" declarations in their inmate records.

For these reasons, if this case were to proceed to a jury trial, and if that trial were held in Richmond, the resulting staffing shortage at ROSP, caused by the absence of the parties and witnesses, would critically undermine the safety and security of that prison. Considering the many logistical difficulties posed by trying a case of this nature over 350 miles away from the prison, a Richmond trial would impose a significant burden on not just the named ROSP defendants, but would also greatly strain any remaining ROSP staff and would deplete overall prison resources.

Id. ¶¶ 7-9, 13-14 (internal paragraph numbers omitted).

Kiser further notes that the above problems would not occur

if the matter was tried in the Western District of Virginia:

These same logistical concerns would not be present if this case were tried in the federal courthouse in Big Stone Gap, or even in Abingdon. Considering the close proximity of the prison to those courthouses, the prison would be to rotate shifts and allow for the temporary absence of employees who might need to appear in court to testify. Also, ROSP is accustomed to transporting inmates back and forth to those courthouses to testify and no relocation or reassignment would be required in order to bring those witnesses to court for the purposes of testifying to the jury.

Id. ¶ 15.

28

Reyes correctly notes that Defendants have not complied with the requirement to provide particularized information regarding the potential testimony of these witnesses and how that testimony is material and non-cumulative. See Koh, 250 F. Supp. 2d at 636. "But, the Court has relaxed that requirement in cases in which the movant provided uncontroverted evidence that witnesses were located where the alleged unlawful activities took place-the 'center of activity' of the case." Kabat v. Bayer Cropscience LP, No. 3:07-CV-555, 2008 WL 2156744, at *3 (E.D. Va. May 22, 2008) (citing Telepharmacy Sols., Inc. v. Pickpoint Corp., 238 F. Supp. 2d 741, 744 (E.D. Va. 2003)). Thus, the failure to proffer particularized testimony with respect to each prospective witness need not doom a defendant's motion where it is plain that the vast majority of the testimony about the action will be generated by witnesses located in the district to which transfer is sought. Seaman, 2019 WL 1474392, at *6 (observing that witness testimony can be offered "by affidavit or otherwise" (quoting Koh, 250 F. Supp. 2d at 636)).

Reyes' claims all concern his confinement in Red Onion for the last decade or so. It is plain that Reyes, who is located in the Western District will need to testify to support these claims. The burden of moving and housing Reyes for the duration of any trial falls on Defendants. Cf. Starnes v. McGuire, 512 F.2d 918, 931 (D.C. Cir. 1974) (footnote omitted) ("The burdens and dangers

involved in transporting a prisoner across long distances are, in our opinion, a significant inconvenience to the Bureau of Prisons and will normally justify transfer.") Further, if Reyes chooses to call inmate witnesses to support his claims, those witnesses also would likely be located in the Western District. Id. Additionally, in order to counter or justify the circumstances of Reyes' confinement, Defendants will be required to call prison employees from Red Onion to defend against Reyes claims. See, e.g., Keitt v. New York, No. 12 CIV. 2350, PAE, 2013 WL 3479526, at *3 (S.D.N.Y. July 10, 2013) (finding that witnesses in prison abuse suit were likely to be located at or near the correctional facilities where the abuse occurred). Given that Reyes' claims do not involve isolated incidents,[7] but charge prolonged periods of neglect and mistreatment, Defendants obviously will be required to call a significant number of current and former prison employees, in addition to the ten Defendants who are currently employed at Red Onion, in order to defend themselves.

On the other hand, there appears to be little to no reason with respect to witness convenience to maintain this matter in the Eastern District of Virginia. The four Defendants who reside in

---

[7] For example, Reyes generally contends that he was regularly denied showers, recreation, and meals. As Reyes fails to attach specific dates to these allegations, defending against them would require testimony from numerous correctional officers who interacted directly with Reyes over the last stretch of years.

the Eastern District of Virginia do not object to traveling to the Western District to accommodate the other Defendants and witnesses. ECF No. 40, at 14.

Reyes identifies two mental health experts who he intends to call as witnesses, Dr. Stuart Grassian and Dr. Michael Alpert. ECF No. 48, at 17. Both Dr. Grassian and Dr. Alpert reside in Massachusetts, near Boston. Id. at 18. Additionally, Reyes contends that he expects to call as a witness "a correctional expert with highly relevant experience reducing solitary confinement populations without sacrificing safety and security." Id. (citing Agraharkar Decl. ¶ 11.) This expert lives in Washington state. Id. As all of Reyes' proposed experts will have to fly in from other states, the Eastern District of Virginia is a no more convenient forum than the Western District of Virginia.

Reyes also says that he intends to call his sister, who lives in Alexandria, to testify as to his demeanor, mental health and family relations prior to his prolonged stay in isolation. ECF No. 48-1, at 2. Reyes contends it would be significantly easier for his sister to appear in Richmond, which is 104 miles from her home, as opposed to Abingdon, which is 366 miles away or Big Stone Gap, which is 426 miles from her home. Id. Admittedly, Richmond is the more convenient forum for Reyes' sister. But, the other evidence before the Court strongly establishes that the Western

31

District of Virginia will be the most convenient forum for the vast majority of witnesses. Accordingly, this factor weighs heavily in favor of transfer.

### 3. Convenience Of The Parties

"The Defendants, as movants, must show (1) that the original forum is inconvenient for them and (2) that [Reyes] will not be substantially inconvenienced by the transfer." Seaman, 2019 WL 1474392, at *6 (citing Fitzgibbon, 2019 WL 470905 at *3; Koh, 250 F. Supp. 2d at 636). Kiser's affidavit amply demonstrates that Defendants as a whole would be substantially inconvenienced by conducting a trial in the Eastern District of Virginia. While Defendants may be exaggerating somewhat the total number of potential witnesses, it is apparent that it will require significant shifting of VDOC resources at Red Onion to conduct a trial on this matter in the Eastern District of Virginia. Other than the longer trip for Reyes' sister, Reyes will not be inconvenienced at all by conducting the trial in the Western District of Virginia. This factor strongly favors transfer to the Western District of Virginia. Id. at *7 ("When a 'plaintiff chooses a forum away from home,' then 'plaintiff's venue choice is given less weight and if the venue substantially inconveniences defendants, transfer may be ordered.'" (quoting Bd. of Trs., Sheet Metal Workers Nat. Fund, 702 F. Supp. at 1259)).

### 4. The Interest Of Justice

"The last factor for the Court to consider is 'the interest of justice,' which encompasses public interest factors aimed at 'systemic integrity and fairness.'" Seaman, 2019 WL 1474392, at *7 (quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 30 (1988)). Judicial economy and the avoidance of inconsistent judgments are prominent among the principal elements of systemic integrity. See Fitzgibbon, 2019 WL 470905 at *4; U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd., 357 F. Supp. 2d 924, 937-38 (E.D. Va. 2005). Other factors include "the pendency of a related action, the court's familiarity with the applicable law, docket conditions, access to premises that might have to be viewed, the possibility of unfair trial, the ability to join other parties, and the possibility of harassment." Koh, 250 F. Supp. 2d at 639.

Both the avoidance of inconsistent judgments and judicial economy favor transferring the action to the Western District of Virginia. In the decades that the undersigned has been sitting in Richmond, this Court has not ever issued a final judgment as to whether the conditions at Red Onion and the Step-Down Program pass constitutional muster. However, the United States District Court for the Western District of Virginia regularly addresses those issues. See Mem. Supp. Mot. Dismiss 22 n.8 (citing cases). Thus, the possibility for inconsistent judgments respecting the constitutionality of the conditions at Red Onion and the Step-Down

33

Program will be greatly reduced if this matter is transferred to the Western District of Virginia.

In his Complaint, Reyes demands, inter alia, "permanent injunctive relief requiring Defendants to cease the use of solitary confinement for Plaintiff and to transfer him to an inpatient mental health hospital for proper diagnosis and care, and to then house him in a non-solitary unit with appropriate access to mental health care programming and supports." (Compl. 59.) Judicial economy often dictates transferring an action to the forum that is the best position to enforce and monitor any injunctive relief. See Boyd v. Snyder, 44 F. Supp. 2d 966, 971 (N.D. Ill. 1999) (observing that, "because plaintiffs seek to enjoin further implementation of the allegedly offensive policies, the locus of policy implementation is more relevant than the locus of policy creation"); Law Bulletin Publ'g, Co. v. LRP Publications, Inc., 992 F. Supp. 1014, 1021 (N.D. Ill. 1998) (citations omitted). Because Reyes is confined in the Western District of Virginia and the conditions of incarceration which he challenges are located in the Western District of Virginia, that forum is the better forum to enforce and monitor any injunctive relief. "This consideration strongly favors transfer." Coll. Craft Cos., Ltd. v. Perry, 889 F. Supp. 1052, 1056-57 (N.D. Ill. 1995) (citing Cent. States, Southeast & Southwest Areas Pension Fund v. Brown, 587 F. Supp. 1067, 1071 (N.D. Ill. 1984); Habitat Wallpaper & Blinds, Inc. v.

K.T. Scott Ltd. P'ship, 807 F. Supp. 470, 475 (N.D. Ill. 1992)).
Accordingly, the interest of justice strongly favor transferring
this matter to the Western District of Virginia.

Because the majority of factors strongly favors transferring
the matter to the Western District of Virginia, Defendants' Motions
to Transfer (ECF Nos. 39, 44) will be granted.

### III. CONCLUSION

Defendants' Motions to Transfer, ECF Nos. 39, 44, will be
granted.    The Clerk will be directed to make all appropriate
arrangement to transfer this matter to the Western District of
Virginia.

Defendants' also filed a Motion to Dismiss under Rule 12(b)(3)
for Improper Venue.   Because the interest of justice warrant the
transfer the action, the Motion to Dismiss under Rule 12(b)(3) for
Improper Venue, ECF No. 13, will be denied.

The Clerk is directed to send a copy of this Memorandum
Opinion to counsel of record.

It is so ORDERED.

_____ /s/ _REl'___

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September _/_, 2019

35